## ELLIOTT v. PEET.

(District Court, E. D. Pennsylvania. January 9, 1912.)

No. 600.

1. BANKS AND BANKING (§ 171*)—DEPOSIT OF CHECKS—FAILURE TO FORWARD.
    Where defendant, after depositing a check in the bank of which he was president, acquiesced in the bank's retention thereof, and the check would not have been paid, if forwarded sooner, because the maker had not sufficient funds in the bank on which it was drawn to meet it, it was no defense to the defendant's liability on the check, after it had been forwarded and protested, that it was not forwarded in time.

    [Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. § 616; Dec. Dig. § 171.*]

2. BANKS AND BANKING (§ 54*)—CHECKS—OBLIGATION TO PAY—LOANS.
    The M. Bank, from which a corporation in which defendant was interested borrowed large sums of money, having suffered an impairment of capital, it was arranged that the bank should draw a draft on defendant individually to cover such impairment, and that the draft should be made good by the check of the corporation. The draft was drawn, accepted, and paid through the D. Bank, of which defendant was president, the charge being offset by a credit of a deposit of the corporation's check for the same amount which, when presented to the M. Bank for payment, was protested for lack of funds of the drawer to pay it, and on its return defendant directed that it be carried as a cash item

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

of the D. Bank instead of being charged back to his account. *Held,* that the draft not having been intended to be a bona fide loan of money, but a mere pretense to repair the reserve of the M. Bank until danger of governmental examination was over, and the effect of the transaction being to withdraw the amount of the draft from the D. Bank's assets, defendant was bound to make good that amount to the D. Bank.

[Ed. Note.—For other cases, see Banks and Banking, Dec. Dig. § 54.*]

3. BANKS AND BANKING (§ 54*)—INSOLVENCY—OFFICER'S CONTRACT OF EMPLOYMENT—BREACH.

Where the contract of a bank president to serve in such capacity was terminated by no act of the bank, but by its suspension, which disabled both the bank and the president from continuing its affairs, the president's salary ceased when the bank went out of business, and he ceased to preside without any liability of the bank for an unexpired term of the contract.

[Ed. Note.—For other cases, see Banks and Banking, Dec. Dig. § 54.*]

4. SET-OFF AND COUNTERCLAIM (§ 8*)—EQUITABLE DEFENSES—SET-OFF—FEDERAL COURTS.

An equitable defense is not available as a set-off in an action at law in the federal court.

[Ed. Note.—For other cases, see Set-Off and Counterclaim, Cent. Dig. §§ 9–11; Dec. Dig. § 8.*]

5. BANKS AND BANKING (§ 77*)—RECEIVERS—CLAIMS—SET-OFF.

In an action by a receiver of a bank against its former president on an indebtedness, the receiver's alleged misappropriation of a certificate of deposit was not available as a set-off, where there was not sufficient evidence to show that such certificate belonged to defendant and not to a construction company of which the defendant was also president and for whose benefit it was issued.

[Ed. Note.—For other cases, see Banks and Banking, Dec. Dig. § 77.*]

At Law. Action by Milton C. Elliott, as receiver of the National Deposit Bank of Philadelphia, to the use of a stockholder's agent, against F. M. Peet. Judgment for plaintiff.

Loughlin & Bracken, for plaintiff.

V. Gilpin Robinson, for defendant.

J. B. McPHERSON, District Judge. This suit was originally brought by the receiver of the National Deposit Bank of Philadelphia against Frank M. Peet to recover an overdraft of $6,000. The statement of claim was afterwards amended to include two other items—$49 and $577.83—making a total overdraft of $6,626.83. The debts of the bank having been paid and a stockholders' agent appointed, the suit has now been marked to the use of the agent—in effect, of the stockholders, themselves. In December, 1911, the parties agreed to try without a jury, and accordingly evidence was heard and the case was argued before the court. The amount claimed is agreed to be correct as a matter of calculation, but the defendant denies liability in toto for the reasons that will now be considered.

The facts are mainly undisputed; but, whether undisputed or disputed, I find them to be as follows:

At the time of the transactions in question, Peet was, and had been for about a year, the president of the Deposit Bank, and was taking the part usually taken by such an officer in the management of its

affairs. He was also a depositor, and had an active account upon the books. The First National Bank of Manasquan, N. J. (hereinafter called the Manasquan Bank), also maintained such an account, and kept therein a part of the reserve required by the national banking law. The New Jersey-West Virginia Bridge Company (hereinafter called the Bridge Company) was a depositor and a large borrower in the Manasquan Bank, and its business relations with that bank were close and intimate. Peet and some of the persons managing the Bridge Company were also interested together in other transactions. Late in March, 1908, the Manasquan Bank was undergoing examination by the government. Its affairs were not in a satisfactory condition, but what especially concerns us now is the fact that its reserve was below the legal limit. The sum of $6,000 was needed at once to make good the impairment, and in order to meet this situation the Bridge Company agreed as a matter of accommodation to assist the Manasquan Bank, and thereupon drew a draft on Peet individually for $6,000, payable to the order of the Manasquan Bank. This draft was duly indorsed by the bank, and, while it was not formally accepted by Peet, the amount of the draft was charged to his account by his express direction, and was credited upon the account of the Manasquan Bank. Peet was at first unwilling to accept liability upon the draft; but finally agreed to do so upon the verbal promise of Magee, the president of the Manasquan Bank, that the Bridge Company's check would be taken care of in a short but unspecified time. After he accepted liability for the $6,000, and this sum had been credited to the Manasquan Bank, the transaction became a loan from Peet to that bank, and was equivalent to the transfer of that amount in cash. Accompanying the draft was a check of the Bridge Company for $6,000 drawn upon its account in the Manasquan Bank in favor of Peet. Of course, if this check had been paid, Peet's loan to that bank would thus have been repaid, and the transaction would then have become what it was probably intended to be at the first, namely, an accommodation loan of $6,000 from the Bridge Company to the Manasquan Bank. But the check was not paid. It was retained in the Deposit Bank until April 30th, when it was credited to Peet's account and forwarded to the Manasquan Bank for collection. The funds were not there to meet it, and it was duly protested for nonpayment; the Manasquan Bank being then on the point of passing into the hands of a receiver. The check was returned to the Deposit Bank, and if it had been charged—as in the usual course of business a check forwarded for collection and afterwards protested should be charged—against the account of the payee, it would have gone into Peet's account as a debit and would thus have balanced the previous credit. He would then have been just where he had placed himself when he accepted liability for the draft, namely, in the position of a creditor of the Manasquan Bank (and also of the Bridge Company) for $6,000, and his account would have been properly diminished by precisely that sum. But the check was not so charged. On the contrary, Peet directed it to be carried as a cash item among the assets of the Deposit Bank, and it was being carried as such an item when this bank also, in July, 1908, was taken charge of by a receiver. Meanwhile, Peet continued to

draw checks against his account (which, as has been shown, was $6,-000 larger than it should have been); and the result was that when the bank's doors were closed he had drawn out the $6,000 improperly to his credit, and $577.83 in addition. Nothing need be said about the small sum of $49; it stands or falls with the item of $6,000.

[1] Prima facie, the transaction seems plain. Peet made an injudicious loan on insufficient security, and must bear the consequences. He was persuaded to accept a worthless check of the Bridge Company, and a verbal promise from Magee, and in reliance upon these he parted with his money. Undoubtedly the protested check should have been charged against his account, and his direction to keep it in the drawer as a cash item enabled him to make a forced loan from the Deposit Bank by the method of overdraft, and he is now bound to repay it. He objects upon the ground that the check ought to have been forwarded sooner, and that the failure to collect it was therefore due to the negligence of the National Deposit Bank. But the delay was his own doing. He knew that the check had not been forwarded, and he acquiesced in its retention. He could at any time have sent it on. If there was delay, I believe that he agreed to it or directed it, and he cannot now assert it to be negligence and lay it upon the shoulders of his bank. Moreover, even if the check had been forwarded within a few days of its date, it could not have been collected from the Bridge Company's account in the Manasquan Bank, for the Bridge Company did not have funds enough to meet it. Therefore, even if the delay did not take place with Peet's own knowledge and approval, it does not appear that he was injured by the retention of the check until April 30th.

[2] But there is a more serious objection to this defense. In my opinion it cannot be set up at all. It appears from all the evidence—and I find the fact to be—that the whole transaction was a device to deceive the bank examiner. The draft was not intended to be a bona fide loan of money, but to be a mere pretense to repair the reserve of the Manasquan Bank until the danger from the government examination should be over; and it was part of the scheme that, whenever it should be safe to use it in this manner, the check was to be credited to Peet and charged against the account of the Manasquan Bank. Thus the draft and the check were both to be extinguished by mere bookkeeping, and the Manasquan Bank's reserve would return to its impaired condition. What was to be done with the check after it reached the Manasquan Bank does not precisely appear. Magee promised to take care of it, but this was probably not much more than a hope; at all events, it is clear from the evidence that it could not have been paid out of the Bridge Company's account in that bank.

Or the situation may be put thus: If this was a bona fide loan to the Manasquan Bank, it is clear that it has never been repaid. The bank never even attempted to pay it, and while it is true that the Bridge Company took the first step toward payment—that is, it gave its check for the amount due—it never took the vastly more important step of actually paying the check when it was presented. The debits and credits that were entered in the books of the two banks may confuse for the moment, but they cannot permanently obscure the real trans-

action. After the defendant lent the $6,000, he had more than one debtor to call upon for repayment. He had the Bridge Company's check, and he had Magee's promise, whatever that might be worth, as well as the promise of the bank implied by the actual receipt of the money. He has never attempted to enforce Magee's promise, or the implied promise of the bank, and, although he has tried, he has failed to collect the check. Nevertheless, he contends that he has got back his money from somebody; and, when the transaction is analyzed, it appears that in effect he took it out of the coffers of the Deposit Bank. That bank has certainly paid out $6,000 on his checks; it is equally certain that neither the Bridge Company nor the Manasquan Bank ever put that money in the Deposit Bank to Peet's credit; and to my mind the conclusion is irresistible that, if the defense should prevail, the result would be that by mere bookkeeping sleight of hand Peet has ceased to be the creditor of the Manasquan Bank and has compelled the Deposit Bank to take his place. This, upon the assumption that the loan was real and bona fide. But, if it be assumed that the loan was a mere pretense, there are excellent reasons for refusing to allow Peet to evade what he now claims was only an apparent obligation upon any person concerned. He himself testified in effect that the transaction was a mere scheme to deceive the government, and was not intended to bind anybody. Surely, it does not need either discussion or citation to support the proposition that, when a man takes part in such a scheme, he shall make his apparent obligations good if failure to keep them would do others harm. It is certain that harm has already resulted here. The Deposit Bank and its stockholders have been deprived of $6,000 of their money, which has been applied to Peet's private purposes, and they must permanently lose this amount unless he is held to make good the obligation which he now asserts he only pretended to assume. In a word—and I shall not discuss the subject further—either Peet's loan to the Manasquan Bank was real or false. If it was a real loan, he parted with his money, and must look to the Manasquan Bank or to the Bridge Company for payment; if it was merely a pretended loan, he must nevertheless stand by it as if it had been real, for, if he is allowed to repudiate it now, the Deposit Bank must permanently lose the money.

[3] The plaintiff is therefore entitled to recover unless the defenses still to be considered are valid in whole or in part. It is conceded that a set-off of $208.33 should be allowed for a half month's unpaid salary due the defendant as president when the bank closed its doors. In addition, he claims (but I think not with confidence) that he should be allowed for salary during the remainder of the year; his annual salary having been fixed by resolution of the directors at the rate of $5,000, and about one-half not having been paid for 1908. But he ceased to have any duties, or indeed any office de facto, after the receiver took possession, and I am at a loss to understand on what valid ground he can rest his claim. If the salary for half the year was not paid, it is equally true that he did not earn it; and, if he contends that he had a contract to be employed for a whole year, it is further true that he has no claim for damages, for the bank did not break the contract. The superior power of the law, which dominated

the contract, disabled both the bank and himself from going on with its affairs, and the salary ceased when the bank went out of business and he ceased to preside.

[4] He also claims a set-off of several hundred dollars under the following circumstances: When the difficulties of the Deposit Bank became threatening, he pledged a large amount of the bank's securities, and some of his own, with a New York trust company as collateral for a loan of $50,000 for the benefit of the bank. The receiver afterwards paid the loan and redeemed the bank's collateral, but left the defendant's individual securities in the hands of the trust company. In order to redeem these—certain shares of stock belonging to him—he testified that he was obliged to pay to the trust company certain expenses, counsel fees, etc., amounting to several hundred dollars, and he asks to be allowed this sum as a set-off. To this it is enough to say that, even if the evidence upon this subject were more satisfactory, the payment could not be used as a set-off. At the best the claim is not legal but equitable, and is not available in the federal courts as a defense in an action at law.

[5] The remaining item in his claim of set-off is $8,000, and this may be briefly disposed of. It is based upon a certificate of deposit that was issued by the Manasquan Bank on June 19, 1906. The certificate recited that a certain corporation (which, to avoid confusion, I shall call the Construction Company) had deposited $8,000 in the bank payable to the order of "F. M. Peet, Prest." (he being then and now the president of the company) on the return of the certificate properly indorsed. The "Construction Company, F. M. Peet, Prest.," indorsed the paper to a bonding company to be held as collateral security against loss upon a bond given in a suit to which the Construction Company was a party. The certificate afterwards came into the possession of the receiver of the Deposit Bank, and he received credit for it in the settlement of accounts with the Manasquan Bank. The defendant contends that the certificate had then become his individual property, and was not the property of the Deposit Bank. Having therefore been misapplied by the tortious act of the receiver, he insists that the stockholders (who are now virtually the use plaintiffs) should be held liable for the receiver's wrong. A fatal objection to the validity of this contention is that the plaintiff did not offer sufficient evidence of his ownership. He relies upon an agreement dated April 25, 1907, between "W. A. Wilson, of Wheeling, West Virginia, in behalf of himself and certain other stockholders of the New Jersey-West Virginia Bridge Company, * * * as party of the first part, and F. M. Peet of New York, party of the second part, and F. M. Wyant, party of the third part"; and asserts that under certain general terms in this agreement the certificate of deposit (which was then in the possession of the bonding company) was transferred to himself. With reference to this agreement it is enough to say that I have great doubt whether by any proper construction the language relied upon can be stretched to cover the certificate in question; but, even if it be assumed that the certificate is included, the agreement plainly did not bind the Construction Company. It is not a party thereto, and is not proved to have given its consent to the

transaction. It is therefore unnecessary to state any other objection to the allowance of this item as a set-off.

Upon the whole case, I find that the plaintiff is entitled to recover the sums of $6,000, $49, and $577.83, less $208.33, or a balance of $6,418.50, with interest from July 14, 1908. For this sum, judgment may be entered against the defendant.